COURT OF APPEALS
DECISION
DATED AND FILED

December 16, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP1466-FT**

Cir. Ct. No. 2019GN6

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE GUARDIANSHIP OF R. B.-K.:

EAU CLAIRE COUNTY,

    PETITIONER-RESPONDENT,

  V.

R. B.-K.,

    RESPONDENT-APPELLANT.

       APPEAL from an order of the circuit court for Eau Claire County: JON M. THEISEN, Judge. *Affirmed*.

¶1 STARK, P.J.[1] Rory[2] appeals from an order for his protective placement pursuant to WIS. STAT. ch. 55. Rory argues that Eau Claire County failed to prove, by clear and convincing evidence, that he "is so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself … or others." *See* WIS. STAT. § 55.08(1)(c). We reject Rory's arguments and affirm the circuit court's protective placement order.

## BACKGROUND

¶2 Rory has been under a guardianship since 2019, and the County first filed a petition for his protective placement in 2021, when Rory was living with his mother. The subject of this appeal is the 2025 order continuing Rory's protective placement.[3] The circuit court held a due process hearing on the annual review of Rory's protective placement. *See* WIS. STAT. § 55.18; ***State ex rel. Watts v. Combined Cmty. Servs. Bd.***, 122 Wis. 2d 65, 85, 362 N.W.2d 104 (1985). At that hearing, the County called three witnesses: Dr. Jeffrey Marcus; Rachael Burzynski, Rory's social worker; and Heidi Christopherson, Rory's guardian.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). In a July 22, 2025 order, the court placed this case on the expedited appeals calendar, and the parties have submitted memorandum briefs. *See* WIS. STAT. RULE 809.17 (2023-24). Briefing was completed on September 24, 2025.

All references to the Wisconsin Statutes are to the 2023-24 version.

[2] For ease of reading, we refer to the appellant in this confidential matter using the pseudonym he chose, rather than his initials.

[3] Rory states that he is not challenging his guardianship. Therefore, we will not address it further.

¶3　　Marcus testified that Rory has a "mild intellectual disability" and that he is "incompetent at this point." According to Marcus, Rory cannot "care for himself independently," and while Rory "is able to assist in his decision making," "he can[not] self-direct his decision making and be charged with making important key life decisions without the assistance of somebody else." Marcus also opined that Rory is unable "to ensure a safe environment without the assistance of others." Marcus further explained that Rory's impairment is "likely permanent." Marcus' findings were also contained in his written report, which was received into evidence at the hearing without objection. Marcus' testimony and report both state that without support, Rory would present a substantial risk of serious harm to himself.[4]

¶4　　On cross-examination, Marcus acknowledged that Rory was not prescribed any medications at present, that he was "relatively independent" in completing his activities of daily living (ADLs),[5] that he had a part-time job, and that he was not at risk of eloping from his group home. Despite these facts, Marcus explained his belief that Rory "create[s] a substantial risk to himself," stating,

---

[4] Marcus' evaluation of Rory consisted of a 45-minute, in-person clinical examination; a records review; and interviews with Christopherson, Burzynski, and the owner of Rory's group home. Marcus also examined Rory while he was living with his mother in 2021.

[5] There was no discussion at the hearing of what activities were included in the reference to ADLs. We note, however, that WIS. ADMIN. CODE § DHS 10.13(1m) (Feb. 2025) defines "[a]ctivities of daily living" as "bathing, dressing, eating, mobility, transferring from one surface to another such as bed to chair and using the toilet." Relatedly, WIS. ADMIN. CODE § DHS 10.13(32) (Feb. 2025) defines "[i]nstrumental activities of daily living" as "management of medications and treatments, meal preparation and nutrition, money management, using the telephone, arranging and using transportation and the ability to function at a job site."

All references to WIS. ADMIN. CODE § DHS 10.13 are to the February 2025 register.

It has to do with his ability to ensure that his environment is safe. If there is a safety concern, if there are problems with cluttering, an unclean environment, somebody … taking him out of his current living situation, he does not have the ability to self[-]direct where he wants to go.

This was an issue that came up when I met him the last time. Where he was living with his mother and he told me that he wanted to live elsewhere. It was not a safe environment. Yet he was unable to do anything about that on his own and he was not protectively placed at the time.

I don't believe he has the ability on his own to take himself out of an unsafe situation and put himself in a safe situation, but that would be the only reason…. There is no behavior that would create a safety hazard, if that makes sense.

¶5 Burzynski, Rory's social worker,[6] testified that Rory is "able to do the physical ADLs," but "[h]e's not able [to] direct those" on his own. Burzynski testified, for example, that "if something un-routine happened in his day, I don't think [Rory] would have [the] capacity" to adjust, and the ADL "would be put off [his] plate and it would not happen if [Rory] didn't have staff there to provide that care and the guidance and the direction."

¶6 Burzynski also expressed concerns about Rory returning to live with his mother if the protective placement was ended because "this is, kind of, where the issue derives": Rory's mother "is not able to meet her own basic needs. She was failing to pay the electric bill. She was failing to provide food for them…. [T]herefore, [Rory] was not getting his needs met. And [Rory] was not able to direct those tasks either." Burzynski also noted her concern with Rory giving his

---

[6] Burzynski had taken over the file from a retired coworker, who completed Rory's annual review. That coworker's annual review report was admitted into evidence without objection. The report stated that Rory "needs prompts and cues for his [ADLs]," "is prompted daily to brush his teeth," "is prompted to wear clean clothes daily," and "[s]taff is working with him to ensure he washes his hair when he showers" and that "he wipes well [when he uses the restroom] and washes [his] hands."

4

mother his "spending money" "instead of paying for [his] personal care items." According to Burzynski, Rory's mother was previously not cooperative with Rory's guardian in getting services into the home for Rory's benefit, law enforcement had been called to Rory's group home because of his mother, law enforcement also had to be called to their home when Rory was residing with his mother prior to 2021, and "there [were] issues with [Rory's mother] residing with people that have significant criminal histories." Further, Burzynski testified that she had concerns with Rory's mother not being able to provide "stable housing" and that "the initial reason that [the County] had gotten involved … is because of the unsafe condition of the home." Finally, Burzynski admitted that Rory's current placement in a group home was not the least restrictive setting for his needs.

¶7 Christopherson, Rory's guardian, testified that Rory is able to "do self-care," complete his ADLs, access the internet and send e-mails, use his cellphone, and walk "the streets around his residence." However, Christopherson opined that in an emergency, Rory "might get confused at some point with what he should do exactly. And that might be more of a panic reaction." Finally, Christopherson was "concerned that the money that [Rory] earns goes to [Rory]."

¶8 Rory also testified. Rory stated that he can complete certain tasks on his own, such as waking up, showering, and cooking "some stuff by myself," including pizza, hot dogs, and Hot Pockets. He also explained that he has a job at a diaper factory, where he works Monday through Thursday. When the topic of

his mother and money came up, Rory clarified, "I let her … borrow money from me. I don't mind that. She pays me back."[7]

¶9 Upon questioning by his guardian ad litem (GAL), Rory acknowledged that he was not ready to live independently:

> [GAL]. Okay. That's good. And so would you prefer to live on your own or do you want to live with your mom?
>
> [Rory]. Right now my mom. When I'm ready I can live on my own.
>
> [GAL]. When do you think you will be ready? What do you think it will take to get you ready to live on your own?
>
> [Rory]. Maybe in a few years.
>
> [GAL]. But what do you think you need to do to get ready to live on your own?
>
> [Rory]. Be more independent. Know what to do. Pay your bills. Do stuff properly. Drive well. Yeah.
>
> [GAL]. How can you become more independent?
>
> [Rory]. Um—
>
> [GAL]. What are some things that you think you can do more on your own?
>
> [Rory]. Like, what are you thinking of? I don't know.
>
> [GAL]. Okay.
>
> [Rory]. Well, maybe something like take care of your own self. Call in, work. Something like pay the bills on time. Live more independent. I can't think of anything else besides pay the bills.

---

[7] The County attempted to ask Rory more questions about his mother, but Rory's counsel objected. The circuit court sustained the objection, stating that "at this juncture I have no nexus to money borrowed to his mom connected to the issue before the [c]ourt which is a substantial risk of significant harm to himself."

¶10     The GAL also asked Rory what he would do if there were a fire in his home:

> [GAL]. What would you do if there was smoke coming out of the stove?
>
> [Rory]. I'd either get something to—oh, God.  Use the fire extinguisher.
>
> [GAL]. Okay.
>
> [Rory]. Obviously, that's it.  Use the—I don't know.  But use the fire extinguisher is the obvious one.
>
> [GAL]. Do you know where that—do you know where that is?
>
> [Rory]. Yes, yes.
>
> [GAL]. Okay.  And what would you do if the fire alarm was going off?
>
> [Rory]. Like an actual fire, I would dial 9-1-1.

¶11     At the hearing, the circuit court also engaged in the following exchange with Rory:

> THE COURT: You work, you have a job across town.
>
> [Rory]: Yes, your Honor.
>
> THE COURT: And you get there, I thought you said either by bus or by someone from the group home?
>
> [Rory]: Yeah, I did both at the time.  At the other group home I did.
>
> THE COURT: Okay.  Let's pretend that you came out of work.  Are you alone?
>
> [Rory]: No, I can't be alone.  Like what?
>
> THE COURT: When you get done with work and you have to go get the bus.
>
> [Rory]: Oh, some other person is at work with me, your Honor.
>
> THE COURT: Somebody helps you find the bus?

7

[Rory]: No, it's right there at the house.

THE COURT: Okay. But when you're done with work, how do you find the bus?

[Rory]: I know which bus to take because someone else—

THE COURT: Somebody tells you?

[Rory]: Somebody actually from the group home goes with me, your Honor.

THE COURT: What if you were waiting for the bus out on the corner alone and the bus never came?

[Rory]: Oh, that's not a good thing. I would tell work that I might be late. Have someone take me there. That's the only thing I can think of.

THE COURT: What if you don't know where you are on what corner? Let's say you're lost. You're waiting for the bus. Okay?

[Rory]: Okay, your Honor.

THE COURT: And the bus never comes.

[Rory]: Nope.

THE COURT: What do you do?

[Rory]: I was thinking wait for another one. Like I said, someone would take me—work.

¶12     After hearing arguments from the parties,[8] the circuit court made several findings on the record. Based on a stipulation between the parties, it found that Rory has a permanent "developmental disability." The court further found that Rory "does not pose a substantial risk of harm to others" and "does not pose a substantial risk of harm to himself through exploitation." Nevertheless, the court

---

[8] The circuit court also asked for the GAL's recommendation, and she opined, "I do think [Rory] needs protective placement, although, I do think the [c]ourt can consider [Rory] moving to a lesser restrictive placement…. I think it's clear he needs assistance. I don't think he's quite there yet that he's able to do everything on his own."

found Rory "to be extraordinarily vulnerable" and was "convinced that [Rory] probably could be taken advantage of." The court noted that Rory was able to complete his ADLs, but it acknowledged testimony that Rory needs "daily assistance" and "prompting" to complete those tasks. Based on the testimony, the court also found that Rory cannot "remove himself from unsafe situations."

¶13 Notably, the circuit court referenced Rory's testimony that "he was not ready for his own apartment" and "that if the protective placement would end that he would go [live] with his mom." The court then made its own observations about Rory's testimony, stating, "He came across as confused. Easily detracted. He had tangential thinking. He would circle back and answer questions. He laughed one time when I wasn't really sure what he was talking about and he spontaneously repeatedly asserted issues or statements about his mom." According to the court, "if [Rory was] in an emergency situation it's not clear to the [c]ourt from his direct testimony that he would know how to handle it." The court also reiterated the testimony that Rory's mother "does not have the ability to provide a level of care supervision necessary to avert a substantial risk of serious harm to [Rory]," and it found that Rory "is not able to set limits [or] boundaries [to] avoid being taken advantage of," which are "necessary to avert the substantial risk of serious harm to self."

¶14 Ultimately, the circuit court found that the totality of the circumstances of Rory's "disability/experience leaves him at a substantial risk of serious harm to himself. Not being able to handle an unsafe situation safely. So for that reason, I conclude that the protective placement should continue." Thereafter, the court entered a written order continuing the protective placement but ordering the County to reassess for placement in a less restrictive environment. Rory appeals.

**DISCUSSION**

¶15 A circuit court may order protective placement for an individual who meets all of the following criteria:

> (a) The individual has a primary need for residential care and custody.
>
> (b) The individual is a minor who is not alleged to have a developmental disability and on whose behalf a petition for guardianship has been submitted, or is an adult who has been determined to be incompetent by a circuit court.
>
> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.
>
> (d) The individual has a disability that is permanent or likely to be permanent.

WIS. STAT. § 55.08(1). These standards must be established by clear and convincing evidence. WIS. STAT. § 55.10(4)(d). A protective placement is also subject to annual review, and, when contested, a full due process hearing is required to determine whether the individual continues to meet the standards under § 55.08(1). WIS. STAT. §§ 55.10(4)(d), 55.18(1)(a), (3)(d), (3)(e); *see also* **Watts**, 122 Wis. 2d at 85.

¶12 Our review of the circuit court's order to protectively place a ward presents a mixed question of fact and law. *See* **Walworth County v. Therese B.**, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377. We will uphold the circuit court's factual findings unless they are clearly erroneous. *Id.* "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784. Whether the evidence satisfies the legal standard

for protective placement is a question of law that we review de novo. *Therese B.*, 267 Wis. 2d 310, ¶21.

¶16    In this case, Rory challenges only the third standard of WIS. STAT. § 55.08(1)—paragraph (1)(c). Under that standard, the County must establish that the "risk of serious harm" is "substantial." *See K.N.K. v. Buhler*, 139 Wis. 2d 190, 202, 407 N.W.2d 281 (Ct. App. 1987). "The harm envisioned may not be based on mere speculation but must be directly foreseeable from the overt acts or omissions of the individual." *Id.* "[M]inor accidents, injuries and illness are not sufficient to satisfy this requirement." *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 515, 275 N.W.2d 143 (Ct. App. 1979). However, the danger need not "be proven by *recent* acts or omissions." *K.N.K.*, 139 Wis. 2d at 203. Here, Rory specifically argues that the County "has not proven that any specific, serious harm is substantially likely to occur" and that it "can only point to vague, speculative concerns that do not meet the statutory standard." (Formatting altered.)

¶17    In support of his position, Rory cites *Outagamie County DHHS v. L.C.E.*, No. 2023AP929, unpublished slip op. (WI App June 4, 2024).[9] In *L.C.E.*, we concluded that testimony stating that L.C.E. "would be 'vulnerable to the abuse of other people,' might stop taking her medication, and might not be able to perform all the activities of daily living" was "speculative and vague" and did "not rise to the level of the specific and substantial risk of serious harm required by

---

[9] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

11

WIS. STAT. § 55.08(1)(c)." *L.C.E.*, No. 2023AP929, ¶15. We explained that the testimony

> did not specify what kind of abuse [L.C.E.] would be "vulnerable" to; why [L.C.E.] takes the medication and what symptoms may reappear if she stops taking medication; what activities of daily living [L.C.E.] may not be able to perform on her own; how any of these factors would affect [L.C.E.'s] ability to care for herself; or how any of these concerns would lead to serious harm to [L.C.E.] or others.

*Id.* Further, a physician testified that L.C.E.'s "apartment was '[q]uite dirty' and could worsen if [L.C.E.] were not protectively placed," but we determined that "this vague concern [did] not demonstrate that [L.C.E.] is totally incapable of providing for her own care." *Id.*, ¶17 (first alteration in original).

¶18 Likewise, in *Monroe County v. H.K.B.*, No. 2024AP1305, unpublished slip op., ¶1 (WI App Jan. 16, 2025), which relied on *L.C.E.*, we reversed an order continuing a protective placement based on insufficient evidence. There, a clinical psychologist "testified generally that H.K.B. was not able to provide for her own needs or safety, that she was vulnerable to the influence of others, and that historically H.K.B. 'ha[d] not been able to manage' without residential care and custody." *H.K.B.*, No. 2024AP1305, ¶13 (alteration in original). We concluded, however, that this testimony was too "vague and [did] not identify any specific harm that [was] directly foreseeable or serious, or of which there [was] a substantial risk," and that absent this specificity, the evidence did "not sufficiently show that H.K.B. presented a substantial risk of a serious and foreseeable harm under WIS. STAT. § 55.08(1)(c)." *H.K.B.*, No. 2024AP1305, ¶13.

¶19 Although this is a close case, and we acknowledge the similarities between this case and *L.C.E.* and *H.K.B.*, we conclude that the record contains

12

sufficient evidence to demonstrate that Rory continued to meet the standards for protective placement. Here, Rory would be at a substantial risk of serious harm to himself without protective placement because he is unable to provide for his basic needs independently and is unable to handle dangerous situations appropriately. In addition, he maintains a desire to return to the same environment that initially prompted his protective placement—living with his mother. The difference between this case and *L.C.E.* and *H.K.B.* hinges significantly on Rory's own testimony—both his direct statements and what his testimony demonstrated to the circuit court—as well as Rory's history with his mother.

¶20 Rory has never lived independently, and he testified that he is not ready to "live on [his] own" right now. According to Rory, in order to live on his own, he would need to "[k]now what to do" and "take care of [his] own self," but he admits that he is not ready to do that right now but "[m]aybe in a few years." Further, he had no clear idea as to what he would need to do to be prepared to live on his own. As a result, Rory specifically testified that he would return to living with his mother should the protective placement be terminated.

¶21 Marcus' testimony concurred with Rory's assessment that he was not ready to live independently. Marcus explained that Rory cannot "self-direct his decision making and be charged with making important key life decisions without the assistance of somebody else" and that he is "unable to ensure a safe living environment for himself." Marcus' report also concluded that "[p]rotective placement appears warranted for basic aspects of the subject's health and safety. He requires support[] in several areas of daily living. His wellbeing would be put in jeopardy without availability of these supports. He presently requires a setting with 24-hour staff supervision." Rather than leaving his testimony speculative and vague, Marcus specifically related his opinions to a foreseeable circumstance

13

based on Rory's history: living with his mother in an unsafe environment and being unable "on his own to take himself out of an unsafe situation and put himself in a safe situation."

¶22     Burzynski's testimony further supported a conclusion that Rory living independently would create a substantial risk of harm to himself.   She explained that although Rory is able to physically do his ADLs, he cannot "direct those" on his own.  Burzynski also expressed her concerns about Rory returning to live with his mother as an example of a foreseeable result if the protective placement were not continued, and she cited specific safety concerns that would present a substantial risk of serious harm to Rory in that event, including Rory's mother not paying the electric bill, not providing food for them, not maintaining housing, hoarding, and "residing with people that have significant criminal histories."  Burzynski's concern for Rory's safety under the above circumstances was that Rory "was not able to direct those tasks either."

¶23     Accordingly, the circuit court found that Rory is "not able to self[-]direct his ADLs."  On this record, we suggest that the court's finding would include not only acts such as "bathing, dressing, [and] eating," but also activities like "meal preparation and nutrition, money management, [and] arranging and using transportation."  *See* WIS. ADMIN. CODE § DHS 10.13(1m), (32).  Based on the evidence, this finding is not clearly erroneous.  Further, the court, which had the benefit of hearing Rory's testimony in person, characterized his responses to the hypotheticals presented about a fire and bus transportation as "concerning," "confused," "[e]asily detracted," and "tangential."  Despite Rory's argument that his answers to these questions were "exemplary" and "ideal," our review of the hearing transcript demonstrates that the court's finding on this issue was not

clearly erroneous, and, as the County asserted, the "court had sufficient concerns about Rory's responses to question his ability to handle emergency situations."

¶24 As noted, Rory lived with his mother until 2021, and it was because of the County's and the circuit court's conclusion that this living situation was unsafe that Rory was protectively placed. Rory now intends to return to living with his mother if the protective placement is terminated, but, as the circuit court found, he does not yet have the skills necessary to provide for himself and/or recognize and remove himself from unsafe situations in his mother's home, such as those that have materialized historically. Past events have demonstrated that his mother is also unable to provide him with appropriate assistance.

¶25 While the circuit court found no "nexus" between Rory's mother and a "substantial risk of serious harm to self," the court did so in the context of a discussion concerning her "influence" on Rory related to "poor decisions" and her financial exploitation of Rory. The court nonetheless recognized that Rory's mother could not "provide a level of care [and] supervision necessary to avert a substantial risk of serious harm to" Rory and that Rory's inability to set boundaries and remove himself from dangerous or exploitive situations created the risk of his serious harm. These facts all culminate in a vulnerable adult living in unsafe conditions, which creates a substantial risk of serious harm to Rory. This is not a speculative concern, but one that Rory faced in the past, and if the protective placement is terminated, one he is likely to face again.

¶26 Further, Rory's answers to the GAL's and the circuit court's questions show that he has not sufficiently developed the executive functioning necessary to make decisions in unexpected or emergent situations. He essentially stated that he would look to others for help. The substantial risk of serious harm

inherent in getting lost while taking the bus and being unable to find his way home, or in being unable to appropriately handle an emergency, is evident and foreseeable under these circumstances.

¶27 Rory argues, however, that "[a]s in *H.K.B.* and *L.C.E.*," the County has only offered "conclusory opinions that a protective placement is necessary 'to ensure [Rory's] environment is safe and his basic needs are met,'" which he claims "cannot satisfy the WIS. STAT. § 55.08(1)(c) standard." *See K.N.K.*, 139 Wis. 2d at 202. According to Rory, "[b]road concerns about [his] ability to address day-to-day situations, including emergencies, do not meet this standard, especially since [he] has engaged in no previous acts or omissions 'that would create a safety hazard.'"

¶28 For example, Rory compares the circuit court's decision here to this court's decision in *Washburn County v. D.C.R.*, No. 2024AP2443-FT, unpublished slip op., ¶¶31-37 (WI App July 8, 2025), explaining "that evidence of the ward's history of unsanitary hoarding practices, risk of financial exploitation, and failure to take medication, *even when considered together*, does not show a substantial risk of serious harm," but "the fact that D.C.R., who sustained a traumatic brain injury from a prior motorcycle accident, desired and took steps to purchase another motorcycle *did* pose a substantial risk of harm because the evidence proved he could not safely operate a motorcycle." Rory states that, "[h]ere, there is no evidence of any directly foreseeable risk of serious harm, such as a motorcycle accident. Instead, the County has only identified a few vague concerns like those rejected in *D.C.R.*"

¶29 Overall, Rory reads our prior case law too literally, which would essentially foreclose protective placements in the majority of cases. Very few

protective placement cases will involve facts like ***D.C.R.***, where the county can identify a specific harm, such as a motorcycle accident, to support continuing a protective placement order. While "[t]he harm envisioned … must be directly foreseeable from the overt acts or omissions of the individual," ***K.N.K.***, 139 Wis. 2d at 202, WIS. STAT. § 55.08(1) does not require clairvoyance.[10]

¶30     As the County explains, "while Rory has a significant liberty interest at stake, the record clearly indicates his protective placement was never intended to be a 'lifetime sentence'" but "was initiated to provide supported living to assess his strengths and prepare him for independent living." The County's assertion is supported by the record and the fact that the circuit court found that Rory's current placement was "not the least restrictive environment" and ordered the County to reassess that placement. (Formatting altered.) The evidence in this case is sufficient to prove, clearly and convincingly, that Rory continued to meet the standards for protective placement until he could develop greater independence and strengthen the skills to provide for his health and safety. Therefore, we affirm the circuit court's order continuing Rory's protective placement.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[10] Rory also notes that he "would still have a separate, court-appointed guardian if not on a protective placement," and "[t]he County has not explained why a guardian would be unable to supervise Rory's living conditions, continue to manage his finances, and assist him in maintaining a healthy living environment, if needed." *See* ***Outagamie County DHHS v. L.C.E.***, No. 2023AP929, unpublished slip op., ¶16 (WI App June 4, 2024). Rory has been under a guardianship since 2019, but that fact did not keep him from being protectively placed in 2021. Thus, we are unpersuaded by Rory's argument.